Case number 25-5290, American Federation of Government Employees, et al, appellants, v. Donald J. Trump, President of the United States of America, et al. Ms. Golden for the appellants, Ms. Plowch, the attorneys. Good morning, Ms. Golden. Please proceed when you're ready. Good morning, and may it please the Court. Caitlin Golden on behalf of the appellants. I'd like to reserve three minutes for rebuttal. Defendants have all but eliminated the United States Agency for International Development, an agency created by Congress to provide humanitarian assistance around the world. That closure violated the APA, was unconstitutional, harmed plaintiffs, and will cost millions of lives around the world. All of the issues before the Court today go to whether plaintiffs' claims challenging that closure can be heard in federal district court. They can. First, OXFAM has standing. When the agency closed, it dramatically altered the humanitarian landscape. Tens of billions of dollars in foreign aid vanished, and USAID staff's deep expertise in administering humanitarian assistance disappeared. Without USAID, it will be more difficult for OXFAM to fulfill its mission of ending poverty and offering life-saving support in times of crisis. OXFAM has been forced to expend resources to address the loss of funding to partner organizations, and in some cases may be forced to abandon projects entirely. OXFAM has lost the invaluable resource of USAID partnership, expertise, and collaboration, and its efforts to provide life-saving support have been impeded. Second, the two union— Can I just ask you about OXFAM standing, if you were going to switch to somebody else's standing? I was, so happy to talk about OXFAM. Okay, sure. On OXFAM itself, and I can understand why you started there, because the channeling inquiry might be more clear from your perspective with respect to OXFAM than with respect to the unions. So with OXFAM, it seems like there's two theories that you have for why OXFAM has standing. One of them has to do with the notion that USAID is a magnificently large presence in this domain, and if you remove them from the equation, it creates all kinds of effects, including that OXFAM is going to end up maybe having to stop doing some things that it is doing now because there's going to be some voids elsewhere that it needs to fill. That's one way of, I think, characterizing the first one. And the second one is that the absence of USAID makes OXFAM's work more difficult because USAID isn't there as a partner or as a source of guidance and things like that. So if we just focus on the first one for a second, is that a fair, at least, characterization of the two? Yeah, I think our first injury is that the loss has caused OXFAM – it has made OXFAM's work more difficult from a funding and gaps perspective. And then the second injury is the loss of the expertise and know-how. So I think your characterization is fair. Okay, so on the first one, is the idea that because USAID, under your understanding of the situation, no longer exists or is threatened not to exist, then there are initiatives going on in areas that OXFAM cares about, and those are not going to just happen. They're either not going to happen at all or they're not going to happen as well. And so OXFAM has to reconfigure its resource allocations so that it stops doing something that it's doing now and it starts doing something that somebody else used to do but can't do any longer because USAID is not on the scene. I think the injury to OXFAM is more direct than what you are stating. So OXFAM performs its work with partners, and that might mean that a partner is handling one piece of a crisis and OXFAM is handling another. But it also means that there are situations where OXFAM and a partner are working on projects together. And so we give one example in our declarations at JA-138 where OXFAM was working with a partner in the South Sudan to build latrines and provide clean drinking water. OXFAM was bringing one set of money to the project. A partner was bringing another. That partner lost their USAID funding. And so OXFAM was forced to put the project on hold and was in a situation where it would either need to incur a budget deficit to wind down the project or move money away from its other work to keep it going. So thanks for that clarification. So then if we're focusing not on a substitution effect but we're focusing on work that OXFAM is already doing in partnership with somebody else, and that work either becomes impossible or at least a lot more difficult because the partner is impaired by the elimination of USAID, the non-existence of USAID. And I guess my question is this. If you have a circumstance in which OXFAM is working with one partner on a project that matters a lot to OXFAM, and then that partner is funded by USAID, and USAID, it's not the elimination of the entire department, but USAID just terminates its contract with that partner. Does OXFAM have standing to litigate the lawfulness of the termination of the agreement with that partner because it affects the ability of OXFAM to carry out its mission vis-a-vis that project in which it's engaged in partnership with the organization that has now been defunded? You know, I think in that situation you would look to the standard for organizational standing and whether or not that closure undermined OXFAM's ability to engage in its core business activities. And in the situation we are in, you know, it wasn't just a single project in South Sudan. It was projects across the world. You know, OXFAM operates in 80 countries. And so I think here we're going to… Is it a question of scale? I think in part, I think, you know, whether or not something undermines an organization's core business activities is really going to be a fact-specific inquiry that looks at the impact of the government action on an organization's abilities to carry it out. And so that might mean there may be situations where one contract might be enough, but this is a different situation. An entire pillar of the humanitarian space was wiped out, jeopardizing OXFAM's projects across the world. And forcing it to engage in these decisions worldwide, not just with one contract. And so… Is it a question of what claim the plaintiff is bringing? Because in listening to the chief judge's hypothetical, it seems that there is a line between sort of third-party standing. So if you were challenging the cancellation of a grant to a partner that OXFAM was working with, that would be like a third-party standing thing. But if you're just challenging the dissolution of the whole agency, that's not third-party. That's just indirect effects. I guess I'm interested in the difference between indirect effects versus third-party standing. Sure. So this is not a situation where we are asserting standing based on the termination of the grants. You're absolutely right. The fact is… Because Judge Nichols thought it was third-party standing. So it's interesting to understand why that's different. Yeah. So here we're not asserting injuries. You know, the injury OXFAM is asserting is not the injury that its partners experienced when they lost this funding. It's the injury OXFAM has experienced because the partners lost it. But in a third-party standing. Oh, go ahead. I think you could say exactly that thing with a one-party situation where – or two-party situation where it's just OXFAM and a partner. You could say, sure, the partner has its injuries of its own. There's no doubt about it. But OXFAM has its own injuries because it can't carry out its own mission as well because the partner is no longer able to be on the scene in the same way because they lost their funding. So I think I agree with – I'm fairly sure I agree with that. This is a situation where OXFAM is not able to do its work because of the partner's loss of money. And you're correct, Judge Pan, that we are not challenging the termination of those grants. Specifically, we are bringing APA and constitutional claims, challenging the wholesale closure of the agency. And so I do think that puts us in a different situation than a third-party situation where we are terminating the – or challenging the termination of those grants. And, again, you know, OXFAM was facing this situation across the world. The closure of the agency jeopardized their projects, forcing them to incur additional responsibility. And it's made their life of saving work less effective in the humanitarian space. You know, the efficacy of any work depends on activities of its partners, whether it's in partnership with OXFAM or working side-by-side. Can I ask about the second branch of the OXFAM? So that, which is that the theory is that OXFAM is directly affected by the absence of USAID itself as a partner of sorts or at least a source of guidance or something like that. Is that that USAID itself is providing the guidance, the service that OXFAM needs? Or is it that USAID is working with somebody else who's providing that guidance or service and the absence of USAID makes that other party less able to assist? It's that USAID was providing it directly. So USAID provides evidence, research, technical know-how that OXFAM and other humanitarian organizations rely on in doing its work. So that's a service that was provided directly by the agency. There's no intervening third party. And you think that's different from information? It's not an informational injury. It's not that USAID is giving a report or something like that. It's an actual direct service that USAID. Is that the difference you would draw from the informational injury sort of idea? I think so. So it is that USAID staff brought expertise and technical know-how to the field. OXFAM relied on it. And when that information disappeared, their reliance interest was injured. And so I think this is like the Doctors for America case that we cite in our papers where HHS posted information online that doctors relied on in serving their patients. And when that information was removed, it made their work more difficult. And that was enough for Article III standing. That's the same here. Didn't you allege that USAID would send flights, like planes, into areas that you couldn't access without them? Like isn't that much more direct? My understanding is that that is a service USAID previously provided, yes. And so... That just seems much more concrete than all this informational stuff. So I guess I'm wondering why you're not relying just on that. I think our declaration is not specific about whether or not OXFAM rode on those flights. And so we are... Did OXFAM not ride on those flights? I don't have a representation about that. And so I think this is a situation where they provided this research and technical know-how. This is also like the Action Alliance of Senior Citizens of Greater Philly versus Heckler case, which is a 789F2D931, where HHS regulations cut off the flow of information that made it more difficult for an organization to counsel their elderly clients and refer them for services. Same here. This is a situation where USAID provided information, technical know-how, and expertise, and cutting off that information is making it more difficult for OXFAM to do its life-saving work. So if you call it information, then does it fall in the line of informational injury cases? I thought you were saying that it doesn't. I don't think it does. I think informational injury cases involve a statutory right to information and the non-provision of that information. This is more of a situation where there is a reliance injury to OXFAM based on the removal of the research and evidence that USAID provided. If there's nothing else on OXFAM standing, I'd be happy to turn to the union plaintiffs standing here. AFSA and AFGE, the two union plaintiffs, also have standing here. The union plaintiffs experienced an injury, in fact, the loss of the members' jobs. That can be traced to the challenge conduct, the closure of USAID, and that can be redressed by a favorable decision vacating the closure. That's all that's required for Article III standing. Defendant's core argument is that those employment injuries limit the types of claims that plaintiffs can bring, but that's not what is looked at here. When a plaintiff is injured by a policy, they have standing to challenge it, and that's true even when a plaintiff is not injured by every consequence of a policy. So I think it's clear here that the union plaintiffs have standing to challenge the closure. And how do you deal with cases like Gil? Because it just one way to understand that kind of decision is that, yes, there was a plan, a redistricting plan, that then had an effect on multiple districts because it's a jigsaw puzzle. But then the way the court described the injury in that case was it was a district by district problem. And so a particular voter had an injury vis-a-vis one district, not the entire redistricting plan. I don't think there's anything to suggest that there were individual decisions made here. So in this case, in this situation, all of the employees at USAID learned that they were going to be terminated in a single email sent by Jeremy Lewin that confirmed that they planned to retire USAID as an independent operation and said, as part of that process, substantially all non-statutory positions will be eliminated. That's a J162. And so there's not a situation where there were individual decisions made. There was a decision made to close the agency. And then terminating all employees was simply implementing the decision to close the agency. So I think this is slightly different where there was just one decision made. It's not like they went through and decided to terminate each employee individually on a case-by-case basis. The redistricting plan is there's just one map. There's just a creation of one map. And it consists of several districts. But I'm not – I don't think – you can't create one district without thinking about what the other districts look like because if you made one district look one way, then it necessarily affects what the other districts look like. So it's just one map that's created. But then the analysis in GIL, one interpretation is that it presumed that the injury was as to a particular district, not as to the entire map. Sure. So I'm not familiar with the exact facts of that case. But I think the distinction here is the fact that there was one decision. And I think it's appropriate here to look at the higher-level action rather than any sort of employment-specific action as part of the case. Because while the pieces of the map may have affected the other pieces of the map, you know, there's not a way to delineate the termination of employees from the closure of the agency. Finally, I'd just like to turn briefly to channeling. Plaintiff's claims are not employment disputes that are appropriate for the MSPB or Foreign Service Grievance Board. The claims here are APA and constitutional claims. They do not challenge personnel actions. They challenge the unlawful decision to close the agency. There's nothing to suggest that Congress intended for these types of claims to be addressed by those employment bodies. There is no substantive expertise of those employment bodies that is necessary to decide the questions at issue here. And those claims are wholly collateral to the types of claims typically heard by those administrative bodies. And, of course, for OXFAM, which does not represent federal employees, those claims cannot be brought before those boards. Lastly, I'd just briefly like to address the issue the court raised regarding the reductions in force. You know, as I – It only affects one of the – that speaks to one of the unions, right? That speaks – so there are two different statutes here. The MSPB applies to the AFGE employees. The Foreign Service Act, which does not include that, applies to the employees of AFSA. That's correct, the Foreign Service employees. So as I noted, the – here there is no reason to assume that Congress intended for APA and constitutional claims like those brought by the plaintiffs were meant to be channeled. But even if you accept the defendant's view of the world that we are challenging reductions of force, that further supports plaintiff's argument that nothing should be channeled here. The exclusion of RIFs from 7512 tells us Congress did not mean to preclude RIFs from judicial review. Again, we look at whether or not it's fairly – Congress's intent to exclude review is fairly discernible. And here Congress's intent is very explicit. They explicitly carve out RIFs. And so here we believe that further supports plaintiff's argument that reductions in force shouldn't be channeled to the MSPB. As for the Foreign Service employees that you identified, you know, the Foreign Service Act is meant to be interpreted as a companion statute to the MSPB. And so it would likely be appropriate to interpret it in the same way. It doesn't matter for these purposes that there's the other statute that allows by regulation for RIF claims to be – or for a regulation to say that RIF claims can go to the MSPB? I don't think the fact that there is currently a regulation on the books addressing that is relevant for the inquiry here. The Thunder Basin test looks at what Congress intended, and there is – and so I think the regulation puts – is outside of congressional intent. There's nothing in the statute directing the – directing the OPM to make a regulation, you know, channeling claims. And so I think the silence from Congress is what we're looking at here, not the existence of the regulation. I thought you were asking a different question about the Foreign Service Act specifically authorizing the Secretary of State to prescribe regulations. But it also addresses – directly addresses reductions in force. So never mind. Okay. Do you – so your theory about – apart from this question under the – for AFGE and the fact that the CSRA excludes RIFs, your theory is that the claim goes to dismantling the agency, not to your client's employment or not, but consists of employment-related actions. Do you have any other case in which the injury giving rise to the claim is an employment-type injury, but the federal employee is not channeled through – whether through CSRA or through FSL, MRS? I don't have a specific case. But, you know, I think that the channeling inquiry looks at the type of claim a plaintiff is bringing, not the injury they have experienced. And so here the type of claims we are bringing are APA and constitutional claims that do not touch on any portion of the employment injury. And so I think because the Thunder Basin test looks at the type of claim, I think that's the applicable thing to consider here. So there's Thunder Basin, but then Elgin is the one that seems broader and, in a way, harder for you, because Elgin talks about CSRA making MSPB jurisdiction over an appeal dependent only on the nature of the employee and the employment action at issue. So the nature of the employees are federal government employees who are covered in the category, the types of employees who are covered under CSRA. And the employment action at issue being discharge or RIF would be channeled. I understand the employment action at issue language in Elgin to be speaking about the employment action at issue in the litigation. So there the employee in Elgin, the employees were terminated from their jobs, and there wasn't any dispute that what they were challenging was their termination. So you're sort of assimilating Thunder Basin's reference to claim to, like, the employment action at issue is, nobody's disputing that the claim is an employment claim. That's correct. And whereas if you step back and you say, well, you know, there are constitutional claims, there are APA claims, the action here wasn't, I mean, the government didn't wake up and say, let's do some employment actions at USAID. They said, let's take that thing down and move those functions to the state department. So that's at the level where you think there's actually not a conflict or tension between Elgin and the Thunder Basin analysis writ large. That's correct. Does it matter whether we reach AFGE or AFSA standing, and does it matter whether it's organizational or associational for purposes of your case? What are the implications of we just do Oxfam or if we do the unions and hold associational or organizational? I think this case can proceed regardless of whether it's just Oxfam or whether it's Oxfam and the unions. I also don't think it matters whether it's associational or organizational standing. I think if this court finds one plaintiff has standing to proceed, then it's appropriate to remand for further proceedings. Of course, we think all plaintiffs do have standing and that the claim should not be channeled. But the court could just find that one has standing and remand. I actually do have a question. Your union plaintiffs, clients, can they be channeled to the MSPB? I feel like the MSPB deals with individual employment actions. I'm just wondering how channeling would work if it happened in this case with your clients and their claims. What would be before the MSPB and how would that work when it's not individual employment claims being challenged? Sure. So the individual employment claims of the union plaintiffs' members would be before the MSPB. But that's just not what this case is about, is it? You're saying if this case were channeled to the MSPB, what would be litigated there and how? The plaintiffs are unions. Sure. So the union plaintiffs can bring unfair labor practices challenges before the labor relations boards. So that is one path. And then there is an alternative path where the individual employees represented by their unions can bring the claims in the MSPB. So in other words, though, in this case, those are not the claims. So the individual employees' claims would be to their particular termination. That's correct. Would the organizational harms to, for example, well, to either of the unions have a remedy? Could they channel and get a remedy? Organizational as opposed to the associational injuries? Meaning, could they bring an unfair labor practice, bring some sort of proceeding challenging the practices here? Would that remedy their organizational harms and unfair labor practice claims? Or is that just their associational harms because it's affecting their employees? I think the only way for their organizational harms to be remedied would be for employees to be rehired with the agency because their organizational harms involve the loss of their membership base. There's no other organizational harm claimed. It's the membership base. It's the loss of the membership base, and then it's the resources they expended during the course of the shutdown, responding to members and dealing with their inquiries and issues related to the shutdown or the two organizational injuries. Are they seeking some kind of compensatory damages for that? Not in this case. If they were able to go in district court? We're not seeking any compensatory damages for those losses. It sounds like the option of your answers to this line of questioning is that you would have to bring new and different claims before the MSPB than what you're trying to bring here. That's correct. These can't be addressed by the MSPB. It seems very unlikely that the MSPB would address claims like those brought in this case, the APA and constitutional claims challenging the OSM.  Right. But the unions, the point that it's the unions bringing the claims, where would the union, union by union claims get channeled to? So, my understanding is that the unions could bring some sort of unfair labor practice or other. But that's a different claim. I'm not disagreeing with you, Your Honor. Isn't your answer they get channeled nowhere? These claims get channeled nowhere? I'm just not sure. You know, the law here is complicated, and so I'm not aware. So, you think there's a possibility that the unions could bring their claims, APA constitutional claims as unions to the MSPB? No, I do not think that. I think that's the question. Actually, that's not exactly the question I'm asking. I'm asking where would the unions, where's the supposition that the union claims would go for channeling? You don't have to agree that they should go there. Sure. I'm just wondering where is it contemplated that the union claims would go for channeling? My understanding is that the government is suggesting that they could bring claims under the FSL-MRS to channel their claims is my understanding. Obviously, we don't agree with that, and we think that they are appropriately heard here. But that is my understanding of what the government is saying. And those go to the FLRA, just to be acronymically wild. Yes, let's get all our acronyms out now. Yeah, but that's the authority to which they would go. That's my understanding is what the government is saying. You think they shouldn't be channeled, but I'm just. That's correct. So, Congress has repeatedly issued these riders prohibiting the use of any appropriate funds to implement a reorganization or redesign of USAID without prior consultation by the agency with the appropriate congressional committees and without a detailed justification for any proposed action. That's the 2024 legislation. And I just wonder, how do you interpret consultation as used in that legislation and detailed justification? And specifically, is it your position that the Secretary Rubio's missive to Congress that we have in the record does not suffice for those purposes? Sure. So, I think that gets at a merits issue that's not before the court now, but I think our understanding of the consultation requirement is that the missive from Secretary Rubio does not comply with that. It just merely announces some sort of intent. It doesn't engage in any sort of discussion. And so I think it does not satisfy the standard that's been laid out in the appropriations bills. I'm sure our colleagues don't have any additional questions for you at this time. Thank you, counsel. Oh, I have one other question, which I'd rather ask now than wait for rebuttal and eat up your time. I know there are several different cases going on. Have any of the USAID, either foreign service officers or domestic civil service employees, pursued administrative remedies individually to challenge their termination? And do we know anything about the status of that? So, that's not in the record. My understanding is that they have, and that there are various proceedings before the MSPB addressing those issues. My understanding is that there hasn't been any significant headway or substantive progress, though, in those proceedings. Meaning not even any initial decisions or anything? No, that's my understanding. But I can't say I know about every single decision. Thanks. Thank you. Ms. Welch? Good morning, Your Honor. May it please the Court, Sarah Welch for the appellees. The plaintiff unions attempt to separate the sweet from the bitter. They seek to rely on their members' injuries from adverse personnel actions, but avoid the exclusive regime Congress established for addressing federal personnel actions. As my colleague just pointed out, they identify no lawsuit that has successfully end-run the CSRA in this way. Instead, this Court has consistently rejected attempts to evade the administrative scheme by joining less directly harmed plaintiffs or reframing claims as systemic or constitutional. The unions say their claims fall outside the exclusive regimes, governing federal employment actions because they're challenging a decision to shut down USAID and raise the constitutional claims. That maneuver doesn't work either. In their complaint, for one thing, they said they were challenging a series of actions, not a unitary action. And the programmatic relief that they're seeking would go far beyond redressing their injuries, which remain employment-based. That would violate the rule that they have to demonstrate standing for each form of relief sought. The only remaining— That seems to collapse something that I haven't really seen our case law collapse in the past, which is you need to have an injury in fact that's caused by the action you're challenging, by the violation of law that you're challenging. And here, if they're challenging as a violation of law the shutdown of the agency, they have various different harms. It don't take you to be saying, no, no, those harms weren't caused by that violation, by the shutdown, nor that they wouldn't be redressed. But you're imposing a tailoring requirement on a claim. You're basically saying, yeah, you say your claim is an APA claim or, you know, violation, acting contrary to law, but it isn't. It's really an employment claim. And it's reframed. I mean, even in—so what's—where does that come from? I don't see that in CASA. I don't see that in Guild v. Woodford. We have, you know, this extraordinary standing doctrine for generations about aesthetic harm. You go and, you know, some part of a wilderness you're in and it's going to be affected by an unlawful environmental treatment or development or something. And there's not a question, well, could you have brought, you know, a nuisance claim that only affects a corner of that development? And if so, then that's your claim. So you're really making a pretty conceptually ambitious argument. And I'm not sure—I'd like to hear more about where it's coming from and what you think binds us to analyze it in that way. Sure. So I have a few answers, a few ways to think about that. I think conceptually what we're looking at in this case is how does channeling interact with standing in agency action cases? So one piece of authority about the aesthetic injury standing that I would point the court to in particular, I believe it's the Center for Biological Diversity case that involved challenges to 4,000 different wells that the plaintiffs attempted to group together into a single challenge. Those are separate actions. You need to demonstrate standing for each of those, even in an aesthetic injury type of case. Right. Go ahead. I don't want to cut you off. Sure. And the second standing case I would point the court to is Friends of Animals v. Bernhardt. This is 961 F. 3rd 1197. And that case involves another attempt to do what the plaintiffs are doing here, which is group together multiple discrete agency actions into a single action that they can then challenge and seek relief from. And in that case, the court said that the memo that was being challenged involved a host of similar but discrete agency actions, and they needed the elimination of many of those discrete actions caused no injury to the plaintiffs, and therefore they couldn't challenge those. So discrete portions of the memo would be set aside if they were successful, but that was all they had standing to challenge. So the other piece of this is how that interacts with channeling. So I acknowledge that they have framed their claims at a higher level of generality, which is a similar move. So these two cases I've cited tell us that that doesn't get them out of the woods from a standing perspective. And the channeling piece is that they're claims that amount to, that fall within the scope of the CSRA because they are, as the court put it in FOSTO, subject to the comprehensive system for reviewing personnel action taken against federal employees, which is undoubtedly the associational harms at minimum that they're asserting. And I think my colleague on the other side agreed that that's the basis for their organizational harms as well. Once you take those out of the standing analysis because they are channeled to another forum, what's left is that they don't have a protectable legal interest, an injury in fact, with respect to whether USAID retains leases for its headquarters or any of the other distinct portions of the agency action or distinct agency actions that are challenging. So going back to CBD, which is where you started, that case dealt with challenging an agency action. And action was the licensing of oil wells. And licensing is something that the agency does in that well-by-well way. And there may be aspects of the process, the long process of getting authorization to drill that are actually done in a more wholesale way. But that actual, the thing that those claims were challenging was the licensing of individual wells. And they created a construct by saying, you know, this is a, I can't remember the term, but they said, you know, this is the drill area. And the thing is, that wasn't the government's action. The government's action was licensing of an individual well. So that is more like southwest Utah, you know, where the plaintiffs are saying, ah, there's a connection here. And I'm going to put them together. But we have the opposite here where the government and the major decision makers are saying USAID has got to change. We're going to put a moratorium on all its work. We're going to take it down. We're going to recreate those functions in the State Department. So the question I have is if that's, you know, what they're doing is they're challenging agency action. I mean, it's simplest to think about it in terms of the APA. Is this an agency, a final agency action? And that's really defined by the government and the unit in which it acts, not by the court in assessing the standing, the injury that gives a plaintiff the standing to challenge it. And I just haven't seen that kind of, you know, redefining of a claim through the injury, in fact, of a plaintiff. And I don't think that the cases that you cite actually stand for that. So I do think that's exactly what Friends of Animals v. Brehmhardt says. There was a single agency memo in that case, and the plaintiffs purported to be challenging that single agency memo. And the court said the proper way to look at it was with respect to the particular pieces of that memo that were actually injuring the plaintiffs. And then I think the – yeah, I think that's my primary response. Is that a relief question in that case? Or is that a standing? It was a standing question in that case. The court cited Lewis v. Casey in the same sentence that it was saying standing is not dispensed in gross, and the elimination of many of the discrete actions that were bundled together in a single agency memo caused no injury to the appellants, and so they couldn't seek relief from that. But they're distinct agency actions bundled together in a memo. The memo isn't then the action. It seems like that's more the analysis. The plaintiffs were arguing that it was. I'm sorry. Right. And so were they in CBD. So the question is, well, what is the action? And if we're – let's say we're satisfied here. Let's say that, you know, Secretary of State issues a memo and says, we are going to terminate USAID and take all necessary actions to do that, and then we're going to think about what foreign aid functions we want to run out of the State Department. And plaintiffs who are harmed by that, including potential recipients of aid, employees, other partner aid organizations, are harmed by that agency action. If there's no question that the agency action was, as I described, I'm not sure that Friends of Animals or CBD supports your point. So I think I read those cases differently. But setting that aside, taking the single memo sort of hypothetical or how it works in this case. Well, no, I'm saying not a single memo but a single decision, an action. So the most concrete thing is getting rid of USAID. That's what we're planning to do. That's our objective. That's our action. We've decided it, and we are confident. We're not going to talk about it anymore. We're going to get working. So we, of course, dispute that that decision was made. We don't think that that decision was made. No, no, that's why I'm putting it as hypothetical just for purposes of the discussion. And if I could just underline that a little bit. The plaintiffs are pointing today to the final mission memo. But let's not go there. Let's deal with assuming that there's, you know, an action that the government has said. Our objective is to get rid of the agency. So I think in that case. We think we have authority to do it. We think either the limitations and the riders are either unconstitutional or don't mean what we said or we've met them. So two responses. One is that we still think that the plaintiffs would have to show standing to obtain relief from any of the portions of that action. Not separate actions, but portions of that action that they are challenging and that they're seeking relief from. The other piece of my answer, and I think this stands independently, is that all of the attempts to receive relief from personnel actions, even if they flow from a single hypothetical agency action, which we, of course, don't think happened here, those are channeled. Even if they would otherwise be able to be brought in a single APA action, those are still channeled through the CSRA scheme. And I think that's an independent basis. But those are, I mean, it's sort of like if I brought a citizen suit under the Clean Air Act and it seems odd because it seems like if there are nested kinds of claims, you know, there's a big claim, Clean Air Act, federal statute, and then maybe there are also common law claims for, you know, nuisance or something. I mean, this isn't legally accurate, but imagine there's these nested other kinds of things. And I want to bring a citizen suit. You're basically saying, well, no, if there's a smaller action that might be supported by the injury factor claiming for your bigger one, you have to go to the smaller one. And even if it's your interest is different, the relief is different, it's a new way of thinking about standing that I have not actually seen spelled out in cases. And it seems problematic. Does it not seem problematic to you that the plaintiff who's master of her claim and brings a case, win or lose, is told, no, no, you have to pursue a different claim? Sure. So I do think as a matter of how remedies work, that the plaintiff needs to show standing for each form of relief sought. And so if they're seeking something broader than what would actually redress their injuries, they get the more minimal relief that would actually redress their injuries. We're talking, that's remedy, whereas you are actually redoing and reattributing to the plaintiffs a claim. I'm not sure we are. You're bringing a claim, a civil service claim, or an unfair labor practice claim, and they're saying, no, we're not. We're bringing a claim about, you know, a separation of powers claim, or a statutory claim, some of it is appropriations law, about the existence or not of an agency. Because the decision that was taken was on that level, and that's the law that we're looking at. So I don't think that piece of our argument is unprecedented at all. I think that's very familiar in channeling cases. It's very normal for a less directly harmed plaintiff or an organizational plaintiff to bring a claim that's framed at a higher level of generality in an effort to get straight to district court instead of going through the administrative process. That's very common in the Tucker Act context. Except it's not looked at there. It doesn't say you don't have standing to bring, for example, in Elgin, you don't have standing to bring the equal protection challenge to the Selective Service Act. No, sure you have standing. You're channeled. In fact, when you come out the other end, you go to the federal circuit, and you can argue about that. So it's not cutting off standing. So I think you're right that you have a powerful channeling argument, because Elgin is basically saying, you know, look at the nature of the employee and the action taken, and we're going to treat that as channeled. But it leaves, you know, the other claims that aren't as in the heartland for review by the federal circuit. So it's a different move that you're referring to there, I think. And I think it's pretty unique to this case, and that's probably why it hasn't come up before, that we have plaintiffs who derive standing to press their broader claim that they say is bundled together in a single agency action. They possess standing to challenge that only to the extent that they have employment-related harms. So once you do the channeling analysis and subtract out those forms of standing to press those claims or those harms. In fact, the implication is that you still have standing when you emerge with your constitutional claim in your pocket at the federal circuit. Sure. So you're going through a narrow process. And I'll go back and read Elgin about whether it talks about standing. But I don't understand about that. I don't think Elgin had the unusual feature of this case where there was an organizational plaintiff attempting to challenge broader facets of an agency action, or we would say separate agency actions, that it would lack standing to challenge if those were channeled. I do think as to what comes out the other end, I think individual plaintiffs before the MSPB would likely be arguing, and may be arguing already, that their termination was unlawful because it proceeded from this hypothesized singular decision to shut down the agency, and that decision was unlawful. I think they would be pressing that argument, and I think that emerges from the other side of the administrative review process. And I think the unions would be pressing the same kinds of claims through the — It emerges from the other side where then they could go to the federal circuit if they're saying, no, no, you were — there was a RIF, and you were discharged, done, and then they could go to the federal circuit and say, hey, wait a minute. This RIF was only a building block in a big illegal takedown that the president lacks the authority to do. This is an agency created by Congress. So you're saying that you would have standing within the federal circuit to raise those. I think that's right. I think that would be a substantive ground of relief that they could press for their claimed unlawful discharge, and that that would emerge even if the MSPB concluded that it wasn't able to review the constitution. We've been talking a lot about the employee claims in the unions, and channeling naturally comes up with those. Sure. If we just for one second, we can get back to that too, but for Oxfam, I know your argument is that Oxfam lacks standing. Suppose that Oxfam has standing. Then is there a channeling issue? So to the extent Oxfam was seeking redress in the form of undoing federal personnel actions, those would be channeled. Oxfam, of course, can't participate in the process, so that just means that they're in the position of the milk handlers in Block v. Community Nutrition Institute, who were excluded from the administrative process, and that meant that they were not able to bring those claims at all. So we think those claims are channeled, meaning that Oxfam can't raise them in district court or otherwise. So it's like Fausto. I mean, you think that Oxfam is hypothetically within the zone, but then actually the result that Congress intended was that they just don't have any claim at all? I think that's right. To the extent that they think they would have standing to challenge federal employment actions. You can't sort of abstract enough levels away that someone who's – But they're not saying they're complaining about federal employment actions. They're saying they're complaining about the fact that they can't do their relief work anymore because their relief work is impinged upon by the nonexistence of USAID as a partner. And I'm not meaning to fight the hypothetical. So two pieces of my answer. One, to the extent they're challenging grant terminations, we would have all of our channeling arguments about grant terminations. Otherwise, if they have a claim, if they have standing to challenge this hypothetical decision to close USAID entirely, then we would not have a channeling action to the extent that doesn't challenge either grant terminations or federal personnel actions. So they couldn't receive those forms of relief. Are you saying that nobody has standing to challenge the dismantling of an agency in violation of the APA and the Constitution? Nobody has standing to just channel, to challenge just the whole thing? So I think certainly none of the parties before the court have established standing. That's our position. But it sounds like your methodology would reduce this to a series of actions and nobody would have standing to challenge all of it. So is that the upshot of what you're saying, that nobody has standing to challenge the shutdown of an agency? I do have trouble thinking of who would be the perfectly situated plaintiff whose claims aren't channeled. How about not perfectly situated? Anybody? Could anybody challenge the constitutional dismantling of an agency? I have trouble thinking of who that would be. I think for a lot of agencies, you might think that that would be an end user of the agency's services whose claims would not be channeled. But they only use certain services, so they probably couldn't challenge other aspects. I think the appropriate relief in one of those cases would be an order that says the agency needs to provide that. I think it's not – I'm not sure as a factual matter if USAID has actual end users other than grant recipients. It seems to me that many of these cases that we're looking at, the injury is quite specific, but they're challenging larger action, like free enterprise. It started with a company, didn't like a report that was issued against it, and didn't like an investigation against it. But then they challenged this much broader thing, the whole agency. And it seems to me methodologically what you're proposing is unusual and what Judge Nichols did was unusual. It seems to me that the more conventional way to look at this is kind of the way your friend on the other side said it. You look at the claim that was brought. Here the claim is there's been a dismantling of the agency in violation of the APA and the Constitution and statute. Did that agency action injure the plaintiff? They say, yes, we lost our jobs. And would that injury be redressed if we set aside or enjoined the unlawful action? Yes, it would because the agency wouldn't be dismantled and you would get your jobs back. That seems like a conventional view of standing. But what you're saying is we don't look at the claim brought by the plaintiffs. We look at the injury they experienced, and that injury is related to RIFs or losing their jobs. And then they have standing only to address that aspect. So we're going to rewrite their claim. Their claim is no longer a challenge to the dismantling of the agency. Their claim is now only a challenge to the RIFs or the employment actions. And this rewritten claim that the court has chosen for the plaintiffs has to be channeled. That just strikes me as a very unusual way to approach standing and inconsistent with the way standing. We have a lot of cases on standing. This seems inconsistent. And when you look at Judge Nichols' opinion, he doesn't rely on much. I just don't see what we're relying on here to do this very unconventional thing that Judge Nichols has done. So a couple of responses. One, I think a fair number of my responses go to my earlier discussion with Judge Pillard about how this is an unusual case where we have. But it's not unusual because in all of these cases, like Free Enterprise Fund, they're looking at, you know, one small thing that happened to this company, but they're challenging a much broader action. In PETA, you know, they're looking at, oh, we're not getting information, but we're challenging, like, a whole regulatory thing. Like, it's very common for the injury to be specific but the claim to be broad. I think the missing piece of that. So, one, I think it's very normal to look at what the injury is in standing analysis. That's, of course, the first step. And so the claim is not the right framing for the first step of the standing inquiry. It really does look at the injury. Well, whether you're injured by the alleged agency action. Normally, we take the plaintiffs to be the master of their complaint. Their complaint says there's been the dismantling of an agency, but we have a district court that says that's not your complaint. That's not your injury. That's not your claim. Your claim is different. Your claim is about employment, and it needs to be channeled.  And the thing that I think is unusual about this case is that all of the injuries are the exact kinds of things, seeking relief from employment actions. All the concrete legally protected interests that the plaintiffs are asserting, setting aside Oxfam, are the exact things that Congress has channeled to an exclusive review regime. That may be true, but that's not the claim that they brought. They brought a different claim. They filed a complaint saying you've dismantled an agency in violation of the APA and the Constitution and statute. And so once those injuries are subtracted, as Congress has said they must be, because they have to go through this administrative process, our only argument on standing is that they don't have legally protected interests that have been invaded otherwise, once those have been removed. And so there's nothing that allows them to stay in district court at that point. They lack standing once these employment-related injuries have been channeled out, as they have to be. And I think the other piece is that... So assuming that somebody could have standing to challenge a dismantling of an entire agency, you're saying even in the context of a lawsuit like that, you couldn't challenge this aspect of the dismantling. It would have that part of the entire claim would have to be. I guess this is your answer to the Chief Judge's question. That would have to be channeled. That's right. But I thought that you said that when you come out the other end into federal court and into a forum that has the authority to decide the issue, you would have standing to press your claim to the action that was not an action that the MSPB was authorized to act. Right. That's the end of the channel. Once you get to the destination of the channel. So it's not really a standing inquiry because, first of all, you don't need standing for MSPB. You do need standing for court. And in court, they have standing. Well, they don't have standing in the district court. I think that's our point. Well, they don't have. I mean, I think if you lose on the jurisdictional argument, I may have. I was reading. You had cited the Friends of Animals. That was the Bernhardt case. I was just looking at that. But refreshed on that, I missed a couple of beats, and maybe I'm stepping into it as a result. But I thought you answered me by saying that you wouldn't have standing in district court because it's channeled. And I thought, well, actually, isn't that really just the district court wouldn't have jurisdiction? You'd have to be channeled. But then when you are properly in federal court, as is contemplated under the CSRA, you would have standing to bring the very claims that plaintiffs claim to have standing to bring in district court now. I'm puzzling through whether I disagree with that or whether any conceptual disagreements matter. I don't think the district court did anything wrong by saying where does their standing come from, all of their injuries are employment-related, all of those claims, any claims arising from those injuries have to go through the channeling process. And because that's all they're asserting, there's nothing else for me to do here. I'm not sure if it matters conceptually whether you think of all of that as happening under channeling or whether you think of that as standing plus channeling. I think it matters a lot because if it's standing, then it wouldn't, I think, I mean, I agree with the answer that you gave, I think, to me and to Judge Pan, which is that you would have standing in the federal circuit to raise the claim that is the claim about the shutting down as contrary to the APA. I don't think, I think this is the same answer. I don't think they're losing any claims by being channeled first to the FLRA or MSPB or foreign service equivalents. I think everything will emerge at the end of that channeling process. And you don't think that if there were no channeling, that these plaintiffs would lack standing to raise their, to challenge the dismantling of the USAID. I think you're, I think you're limiting that question to the union plaintiffs. If there were no channeling, if Supreme Court overruled Elgin and, you know, just channeling is a bad idea. We don't want to mess with these agency adjudicators. They're, you know, they're neither sufficiently accountable nor sufficiently independent. Let's just have more federal court action. If we were in that world, you wouldn't be making the standing argument that you're making here. So I think we wouldn't be making a standing argument if absent channeling. I think we might still disagree about the proper scope of remedy, but that wouldn't be a threshold jurisdictional question. So I don't, I don't want to suggest that I'm agreeing that, that in order. That makes sense to me. Yeah. But the upshot of, I think, Judge Pruitt's line of questioning is that if you, so the channeling is a jurisdictional issue that is separate from standing. And if your position is that after you're channeled, you would have standing to raise the dismantling of the agency, the whole constitutional and APA claim before the federal circuit. The question is, why would you have standing at that stage of the process, but not at this stage of the process? Just standing, putting channeling aside. And I think I disagree with the premise that they're separate. I think they interact a lot in this case because. Well, the analysis is different. Standing is, do you have injury to, you know, all of the rules of standing to stand before a court making this claim? Whereas channeling is, is this a type of claim that needs to go to a different forum? Analytically separate and distinct. So, if you agree with Judge Pillard that at the end of the channeling process, there wouldn't be standing, like, you could bring those claims before the federal circuit. Challenging the dismantling of the whole agency. Why is there no standing now? So, a couple of responses. One, first, this is in the hypothetical world where there was an actual agency decision, singular decision to shut down the whole agency, which we, of course, disagree. I just wanted to make sure that was clear as a premise of my answer. Two, I think, of course, I agree, separate analytical frameworks. But I think they speak to each other in this case. And so, Judge Nichols' reasoning, which I think is right, was we have to look at what their injuries are. That's step one of the standing process. Channeling tells us at that step, we can't look at the injuries that are channeled because they don't belong in this court at all. And so, they can't be a basis for injuries that are being serviced. The question of why they're standing at the end of the channeling process, but no standing now. I think because it's a analysis that the district court had to undertake. And you can think of it in either direction. Maybe it will be clearer if I say in the other direction. Is it the same analysis the federal circuit would have to make as what we're making now or what the district court had to make? I don't think it would be the same analysis because the federal circuit would have a menu of all possible injuries to choose from. So, there would definitely be an injury, in fact. Because there's no – your theory is at the federal circuit, there's no question about whether some part of the injury has to be channeled away to some other court from the federal circuit. That's right. The federal circuit is the recipient channel in court, not the sending channeling. Right. The federal circuit doesn't have to subtract anything out because it's being channeled elsewhere. So, you think there's this kind of sequential way to do this that you start with standing, you look at injury. But then in looking at injury, the next step in the sequence is you do channeling to figure out, is there part of the injury that has to be channeled? And then you ask, if that does have to be channeled, then you discount that from what's left of injury. Then you look at what's left of injury and you see if that independently supports proceeding in the sending court. Yeah. So, I think that's perfectly sensible. I've also thought about it in reverse where you first do the channeling analysis and then you ask if anything is left. I think either way you get to the same result, which is there are no injuries that can be pressed in the district court at this point. I wanted to ask you the question that we asked you to address an argument about REFs. Thank you, Your Honor. So, the start with Section 7512B, which says that this subchapter does not apply to a reduction in force action under 3502. This subchapter is 7511 through 7515. That does not include the channeling provision, which is 7701. So, the channeling provision, the upshot is the CSRA left to OPM an on-off switch about whether REFs could be subject to review in the MSPB or not. But 7512B makes clear, because it's limited to a specific subchapter of the CSRA, that REFs were very much one of the federal personnel actions that Congress was thinking about when it enacted the CSRA. And so, to the extent OPM decides to flip the switch to off, which to my knowledge has never happened. Of course, I know there's a pending regulation. But if they decided to switch it to off, that would place REFs in the same category as the non-preference eligible accepted employees in FAUSTO. They would simply be foreclosed from review through the administrative process. And that would mean that Congress intended to foreclose those claims. Foreclosure review through the administrative process and in court. There would be no review at all. That's right. And so, walk me through again how you get that. Is it just FAUSTO? So, 7512B makes clear that Congress was thinking about REFs when it was enacting the CSRA. So, this is not something that was sort of beyond the scope of the CSRA in general. It was something that was very present on Congress's mind. And they made the choice to exclude REFs from the coverage of specific procedures provided for in 7511 through 7515. Excluded from channeling. No. No, 7701 is the channeling provision. And 7703 provides for judicial review of the MSPB decisions. 7701 says you can bring a claim in the MSPB if it's provided for by statute or regulation. And that's what allows OPM to either channel it to the MSPB or say that there's no MSPB review and, therefore, no administrative process that would get you into the regulation part of that.  The regulation part of that. I'm happy to give one piece of nuance to this, which is that the longstanding position of the government since Elgin at minimum is that constitutional claims that cannot be brought through the administrative process could be brought directly in district court. So that would be my one caveat. I don't think that's implicated in this case because, of course, there is a regulation that provides for administrative review. And the constitutional part, that's Webster. That's the same position articulated in Elgin in the briefs. My colleagues don't have additional questions for you. Thank you, counsel. Thank you, Your Honor. Scalden, we'll give you three minutes for rebuttal. Great. Just a few quick points, Your Honors. First, to pick up where my friend on the other side left off, I think that this is a situation that is distinguishable from Fausto. There, Congress had provided a scheme for a category of claims by some types of employees to bring claims before the MSPB. So the question there was whether it was fairly discernible that the Congress meant to preclude review for the same types of claims brought by different categories of individuals. And there, Congress looked at the intent of the statute and concluded the intent was to create a singular regime. This is different. Congress carved out RIFs for all employees, and there's nothing to suggest that that meant that RIFs could not be challenged at all. And so there's nothing here to suggest that the intention there by precluding RIFs was to carve out RIFs from review entirely. And that doesn't make sense. RIFs speak to the structure of an agency, and so it seems that Congress would not have intended to prevent individuals from challenging RIFs altogether. Second, you know, my friend on the other side talked repeatedly about how in channeling cases you separate out the injury when looking at the channeling scheme. And I think Justice Barrett's concurrence in the recent NIH case is helpful here. There, there was a set of grant recipients who challenged both their termination of grants but also the administrative policy that resulted in the terminations of their grants. And there, Justice Barrett, in her controlling concurrence, found that those claims dealing with the terminations directly should be channeled to the Court of Federal Claims, but that the APA claims could proceed in federal district court. And the injury there is going to still be the termination of grants, and she didn't suggest that you separate out that injury when looking at whether or not they could have brought those APA claims. And so I think that further supports that you shouldn't split up the injury here for these purposes. And then the last thing I'd like to note is my friend on the other side suggested that a potential individual or entity that could challenge the wholesale of the closure of the agency would be the end user of USAID services, and that's Oxfam. Oxfam relied on the services from the agency, the knowledge, the expertise, and so they should have standing here to challenge that closure. We would ask that the court reverse the district court decision and remand for further proceedings on the merits. Thank you. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan; Pillard; Pan